Luella COLEMAN, Plaintiff,

v.

Byron LEHMAN, Defendant.

Civ. A. No. EC 85–226–GD–D.

United States District Court,
N.D. Mississippi, E.D.

Nov. 10, 1986.

Kenneth Mayfield, Tupelo, Miss., for plaintiff.

Richard C. Coker, Oxford, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

The plaintiff in the instant action, Luella Coleman, was struck by the defendant's car as she was leaving work on June 24, 1981. She has brought the instant action alleging that the negligence of the defendant, Byron Lehman, was the proximate cause of the injuries she sustained as a result of the collision. Subsequent to a bench trial, the court proceeds to make its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Facts

At the time of the accident the plaintiff was a resident of Tupelo, Mississippi and was employed at Aircap Manufacturing Company, located in Verona, Mississippi. The plaintiff, a 43 year old female, was employed as a drill press operator and made $4.90 an hour. The defendant, a Kansas City, Kansas resident, was in Mississippi visiting relatives. The defendant's brother and father are employed at Aircap.

On June 24, 1981, at about 3:30 p.m., the defendant had been visiting his brother and father at Aircap and was in the process of exiting the employee parking lot in a metallic colored Mercury owned by his father. At the same time the plaintiff, who had just completed her shift at Aircap, was in the process of exiting the building to go home. After leaving the building, but while still inside of the Aircap premises fence, the plaintiff had a brief conversation with Ralph Graham, another Aircap employee. Graham was sitting in a chair on the east side of the guard shack. The plaintiff passed by Graham on her way to the parking lot. An exchange of words took place between Graham and the plaintiff, and Graham motioned as if he were getting up to chase the plaintiff. This motion caused the plaintiff to run until she got to the southwest corner of the guard station. At this point the plaintiff had to make approximately a 90 degree turn and go through a gate that was approximately four feet wide. Johnny McCarthy, another

Aircap employee, saw the exchange between the plaintiff and Graham and saw the plaintiff run to the corner of the guard shack. He stated that he could not see whether the plaintiff continued to run after she went around the corner of the guard shack. Mary Lyles, another Aircap employee waiting for her ride, stated that she was on the southwest corner of the guard shack looking toward the highway for her husband. She stated that the plaintiff called out to her causing her to look up at the plaintiff. She said that at that time the plaintiff was not running. From this testimony and from the plaintiff's testimony the court finds that although the plaintiff was running when she got to the corner of the guard shack she probably had stopped running when she went through the gate and proceeded into the employee's parking lot.

The plaintiff testified that as she approached the parking lot she noticed the defendant's car as it was backing out of the parking place. Prior to crossing the lot, she held up her hand motioning to the defendant that she was going to cross the lot. The plaintiff stated that when she held up her hand the defendant's car was facing her but was not moving. She then proceeded to cross the lot without looking back up at the defendant's car. The plaintiff stated that she did not know whether the defendant was aware of her presence, but she thought that he would see her as she motioned for him to stop and as she proceeded to cross the lot. The plaintiff stated that the next time she looked the defendant's car was right up on her and that it was too late for her to dodge the car.

The defendant testified that he was proceeding very slowly after backing out of his parking space so that he could clear the car beside him. Lehman was parked in the third parking space east of the guard shack. He travelled only the width of two parking spaces prior to impacting the plaintiff. He stated that he did not see the plaintiff motion that she was crossing the lot and did not see her until just prior to impact. At the time that the defendant

first saw the plaintiff she was approximately at the middle of his car. The defendant stated that he braked immediately but that it was too late to avoid striking the plaintiff. The car slid a very short distance after the defendant applied his brakes. The plaintiff was struck by the right front portion of the defendant's car and fell to the ground.

The defendant took the plaintiff to the hospital where the plaintiff was treated and released. The plaintiff testified that she went to work the next day but that the pain made it too difficult for her to work. The following day, she went back to see Dr. A.S. Kellum, the doctor that had treated her in the emergency room. She was put in the hospital for several days and was given pain medication, but the pain in her neck and back were not eliminated. The plaintiff was then referred to Dr. Tom McDonald, a neurosurgeon. Dr. McDonald put the plaintiff back in the hospital and found that the plaintiff had a broken vertebrae in her neck. Later, the plaintiff was readmitted to the hospital and a fusion of the bone in her neck was performed. A bone was taken from her hip to make the fusion.

The plaintiff later went back to work for a period of eight months. During this time, however, the plaintiff had to miss work occasionally to go to physical therapy and to other doctor appointments. In March 1982 the plaintiff had to return to the hospital because the bone that had been fused in her neck had slipped. The bone had to be refused by Dr. McDonald. The plaintiff had several other stays in the hospital including one for a CT scan in 1984 by Dr. McFadden.

The plaintiff was also treated by Dr. James T. Robinson, a neurosurgeon in Memphis, Tennessee. Dr. Robinson, due to the plaintiff's consistent complaints, hospitalized her on two occasions. On September 21, 1983, he scheduled surgery and intended to perform laminectomies at the L-4, L-5 and L-5, S-1 vertebrae spaces. Robinson's deposition reveals that upon ex-

amining the vertebrae during surgery he was of the opinion that the disks were not ruptured, but he found a narrowing of the foramina at the L–5, S–1 nerve root pathway. He stated that the narrowed foramina were congenital defects that were aggravated by the accident in June of 1981. He enlarged the nerve root pathway by performing foraminotomies, or a procedure to widen the foramina, and in his opinion this should have eliminated most of the plaintiff's back pain. Dr. Robinson testified that the plaintiff had a 10 percent disability to the body as a whole due to her back problems. He was of the opinion that she could return to work and could perform any task except continual lifting of objects weighing more than 30 to 50 pounds.

The plaintiff was also admitted to Magnolia Hospital in Corinth, Mississippi by Dr. Brown for injections in her back. In all, the plaintiff has been hospitalized some seven times. She testified that she has not been able to work since 1983. The plaintiff testified that she has been in constant pain since the time of the accident and that she now takes pain medication twice a day. She also stated that she has not attempted to work anywhere else because she cannot bear the neck and back pain.

The plaintiff testified that to date she has incurred a loss of income of $45,900 as a result of not being able to work because of the accident. She receives social security disability benefits of $276 per month and $56 for the two minor children she still has at home.

The plaintiff and her husband both testified that the plaintiff's constant pain has caused her to become very irritable, and she has difficulty moving around and getting out of bed. The plaintiff's husband testified further that the plaintiff's pain has caused her to be unable to participate in activities with her six children and four grandchildren. The plaintiff has four scars on her body from the surgeries that she has undergone and has a knot on the back of her neck caused by the fusion of the bone.

The plaintiff's medical bills have had an adverse impact on the Coleman's credit worthiness. Some of the medical bills were not paid promptly due to the plaintiff's lack of financial resources. This resulted in the bills being sent to credit collectors and lawyers. The plaintiff has incurred medical expenses to date of approximately $26,426.65.

### Conclusions of Law

A motorist in Mississippi has the duty to use the amount of care that a reasonably prudent and capable driver would use under the same or similar circumstances. *Williams v. Moses*, 234 Miss. 453, 106 So.2d 45, 48 (1958). This duty includes the responsibilities of keeping alert, keeping a proper lookout ahead of the vehicle, and anticipating the presence of other persons in the area. *Id. See also Coker v. 5–2 Taxi Service*, 211 Miss. 820, 52 So.2d 356, 357, *suggestion of error overruled*, 211 Miss. 820, 52 So.2d 835 (1951).

■ Where a motorist fails to see what a reasonably prudent motorist could have seen by exercising due care, and because of this failure he is unable to avoid an accident, the motorist may be found to be negligent. *Parkins v. Brown*, 241 F.2d 367, 369 (5th Cir.1957). *See also Barkley v. Miller Transporters, Inc.*, 450 So.2d 416, 419 (Miss.1984) (motorist has duty to see that which is in plain view). In the instant case, the defendant had a duty to maintain a reasonable lookout while he was driving the car for persons such as the plaintiff who might appear in the line to be traversed. *Thompson v. Riverside Chemical Co.*, 416 F.Supp. 35, 38 (N.D.Miss.1976) (citing various Mississippi cases). The defendant testified that he could not recall any vehicle or other obstructions that would have blocked his view of the plaintiff prior to her crossing the parking lot. He testified that he was looking in the direction toward which he was traveling but that he did not see the plaintiff until she was at the mid-point of his car directly in front of him. The court is of the opinion that this testimony evidences a failure by the defendant

to maintain a reasonable lookout. The court finds that under the circumstances the defendant would have been able to avoid the accident if he had not failed to maintain a proper lookout. Accordingly, the court finds that the defendant's failure to see what a reasonably prudent person would have seen was a proximate cause of the accident and that this failure constitutes negligence. *Id.*

This case must be distinguished from the case of *Smith v. Alford,* 245 So.2d 188 (Miss.1971). In that case, a six-year old boy suddenly darted out from behind some parked vehicles into the defendant's path, and the defendant struck the boy. The defendant saw the shadow of the child as soon as the child came out from between the parked vehicles and did everything he could to stop prior to impact. In the instant case, there was conflicting evidence as to whether the plaintiff was running at the time of impact. The defendant testified, however, that he did not see the plaintiff running because he did not see her at all until immediately prior to impact. Thus, even if the court accepted the version that the plaintiff had been running, the defendant was not maintaining a proper lookout. Under the circumstances of the instant case where the defendant was driving through an employee parking lot, he should have anticipated that employees would be crossing the lot.

■ Although the defendant was negligent, the court is of the opinion that his negligence was only a contributing cause to the accident and to the plaintiff's resulting injuries. The court is of the opinion that the plaintiff also failed to exercise the degree of care that a reasonably prudent pedestrian should exercise under the same or similar circumstances.

The general statement of law covering the duty of a pedestrian to an operator of a motor vehicle is stated in American Jurisprudence, Second, as follows:

Where a pedestrian being in a place of safety sees or could have seen the approach of a moving vehicle in close proximity to him, and suddenly moves from the place of safety into the path of the vehicle and is struck, he is guilty of negligence which will preclude or diminish recovery for injuries sustained. In most cases under such circumstances, the pedestrian is held guilty of negligence as a matter of law.

7 Am.Jur.2d § 491 at 715.

Prior to crossing the lot, the plaintiff in the instant case should have ascertained that the defendant had seen her signal to him that she was crossing, and she should have ascertained that the defendant was going to remain stopped. In failing to do this, the plaintiff breached the duty of due care that she as a pedestrian owes to motorist. *Cf. Church v. Cochran,* 480 F.2d 155, 155–60 (5th Cir.1973).

■ Mrs. Coleman admitted that she saw the defendant back out of his parking place and proceed to exit the parking lot. She stated that she waived or signaled to the vehicle and then proceeded to walk right in front of it. It is the opinion of the court that the plaintiff failed to exercise reasonable care for her own safety. She merely had to stop and wait for the defendant to pass. Under such circumstances as stated in *Hornburger v. Baird,* 508 F.Supp. 84 (N.D.Miss.1980), Mrs. Coleman owed the defendant the duty to yield the right-of-way.[1] The failure to exercise reasonable care under the circumstances constituted negligence on the part of the plaintiff which proximately contributed to her injuries and damages.

■ It is the opinion of the court that the negligence of the plaintiff and the defendant combined to bring about the plaintiff's injuries and damages. The court is of the opinion that the parties were guilty of negligence in equal degrees. In applying the comparative negligence statute of Mississippi, Mississippi Code Annotated § 11–

---

1. It is noted that *Hornburger, supra,* involved a pedestrian who had ventured into a public thoroughfare, however, the general statement of law extends to any pedestrian who leaves a place of safety to move into the path of a moving vehicle.

7–15 (1972), the plaintiff's recovery is limited to 50 percent of the total damage caused by the accident.

In computing the plaintiff's damages, the court notes that the plaintiff has introduced into evidence copies of medical bills in the total amount of $26,426.65. The defendant questions the necessity of charges incurred at the Magnolia Hospital in Corinth, Mississippi in the amount of $2,697.50, as well as bills incurred for treatment rendered by Dr. McFadden in the amount of $2,234.41 and Dr. Brown of Corinth, Mississippi in the amount of $1,565. The plaintiff testified that all of the foregoing charges had been paid and that they were incurred as a result of injuries sustained in the accident on June 24, 1981. The defendant relies on his cross-examination of Dr. McFadden, a medical doctor of Tupelo, Mississippi who was trained in pediatrics and who now categorizes himself as a specialist in the field of Algology or pain management, to put in issue the reasonableness or necessity for the treatment rendered by Dr. McFadden and Dr. William Brown, a neurosurgeon of Corinth, Mississippi. (McFadden deposition, plaintiff's exhibit No. 24)[2]

■ Rather than performing surgery, Dr. McFadden treats spinal problems and back pain by other means, including the prescription of anti-inflammatory medicines and analgesics, as well as injections. In this regard it should be noted that Dr. Brown, the neuro-surgeon, performed the chemonucleolysis treatments on the plaintiff after she was referred to him by Dr. McFadden. It is apparent to the court that Mrs. Coleman has experienced considerable persistent pain since the incident on June 24, 1981, and although the treatments rendered by Dr. McFadden and Dr. Brown appear to have done little if anything to improve the plaintiff's condition, this court on the proof before it cannot find that the treatment was not reasonable and necessary under the circumstances. The court notes that the defendant to a certain extent did impeach the testimony of Dr. McFadden by the doctor's admissions that he had perjured himself in other unrelated civil cases.

Dr. McFadden testified that in his opinion Mrs. Coleman was totally and permanently disabled when he last saw her in October 1985, approximately one year prior to trial. As heretofore stated, the neurosurgeon, James T. Robinson, who examined Mrs. Coleman in March 1986, felt that she could return to her normal work.

It is significant to the court that the plaintiff did not call Dr. Thomas McDonald, the neurosurgeon who performed the initial surgical procedures on Mrs. Coleman. The first McDonald operation consisted of an anterior cervical fusion and the second operation was apparently necessary when the bone plug placed in her neck slipped. The court notes that in the Mississippi case of *Jackson v. Brumfield*, 458 So.2d 736 (Miss. 1984), the Mississippi Supreme Court held that when it is not clearly established prior to trial that the medical privilege has been waived by the plaintiff, the defendant is entitled to an inference that the plaintiff's failure to call one of the attending physicians as a witness indicates that the testimony of that physician would be unfavorable to the plaintiff. In the case *sub judice* the medical privilege was apparently waived by the plaintiff and neither party elected to call Dr. McDonald whom this court deems to be an important witness.

The court is confronted with a factual situation in which Dr. McFadden, who to a certain extent has been impeached, testified that the plaintiff is in fact disabled although he did not state what caused her disability. He has not examined her since October 1985. Dr. Robinson, the last phy-

---

**2.** Pursuant to § 41–9–119 of the Mississippi Code of 1972, when a plaintiff exhibits bills and testifies that they were incurred as the result of the injuries complained of, they become prima facie evidence that the bills so paid or incurred were necessary and reasonable. The defendant may then rebut the necessity and reasonableness of the bills by proper evidence and the ultimate question is then for the finder of fact to determine whether the same were necessary and reasonable. *Jackson v. Brumfield*, 458 So.2d 736 (Miss.1984).

sician to examine the plaintiff, testified that the plaintiff could return to her normal work with the previously noted exception on continued lifting of heavy objects. Dr. Robinson felt that the plaintiff has only a 10 percent disability to the body as a whole as a result of her back problems and probably an additional 5 percent as the result of the surgery to her neck by Dr. McDonald. Robinson, however, very emphatically testified that Dr. McDonald would be in a much better position to evaluate any disability to the plaintiff's neck. The fact that Dr. Robinson partially attributes the disability of the plaintiff's back to a congenital defect rather than to the accident complained of further complicates the matter of any causal connection between the anticipated future disability and the accident that occurred on June 24, 1981.

It is further significant that there was no proof in the case *sub judice* as to the expected work life expectancy of the plaintiff. There was no expert economic testimony as to the decrease in the value of the plaintiff's earning capacity over the period of her expected work life nor was there any proof as to the effect of inflation, taxes, or an appropriate discount rate to be applied to any loss of future earnings. The Mississippi Supreme Court has held that damages, including any loss of earnings or income, cannot be left to conjecture but must be specifically established. *Mills v. Balius*, 180 So.2d 914 (Miss.1965).

The court is further cognizant of the Mississippi cases that hold that the uncertainty as to the amount of damages will not preclude an award when the proximate cause of the damage is reasonably certain, provided that the damages are reasonably certain and are not purely speculative. *Cain v. Mid South Pump Co.*, 458 So.2d 1048 (Miss.1984), *Hawkins Hardware Co. v. Crews*, 169 So. 767 (Miss.1936). Further, the Mississippi Supreme Court has held that the finder of fact should consider the direct evidence and those reasonable inferences to be drawn therefrom in determining if the defendant's negligence proximately contributed to the plaintiff's damages. *Barkley v. Miller Transporters,*

*Inc.*, 450 So.2d 416 (Miss.1984), *Tombigbee Electric Power Assn. v. Gandy*, 216 Miss. 444, 62 So.2d 567 (Miss.1953).

In the case *sub judice* the plaintiff, a 43 year old female, had been employed for several years at the Aircap Manufacturing Company and was earning $4.90 per hour. She was active and apparently enjoyed good health prior to June 24, 1981. She testified that she was now totally disabled and suffered from back and neck pain that prevented her employment and that up to the trial she had lost some $45,900 in wages because of the accident. Dr. Robinson assigned a 10 percent disability to the body as a whole due to her back problem and an additional 5 percent disability to the body as a whole because of her neck problem. From all of the evidence in the case *sub judice* and from all reasonable inferences to be drawn therefrom, the court is of the opinion that the accident of June 21, 1981 proximately caused a fifty (50) percent loss in the plaintiff's earnings from the date of the accident to the date of the trial hereof and that the accident proximately caused a ten (10) percent permanent reduction in the plaintiff's future wage earning capacity.

The court assesses the plaintiff's damages resulting from the accident in the Aircap parking lot on June 24, 1981 as follows:

1) Past, present and future physical pain and suffering including mental anguish, $25,000;

2) Reasonable medical expenses incurred and those reasonably certain to be incurred in the future, $26,426.25;

3) Lost wages, including lost wages to date and lost or diminished future earnings attributable to the accident, $44,510.

Pursuant to the comparative negligence statute of the State of Mississippi, Mississippi Code Annotated of 1972 § 11–7–15, plaintiff is entitled to recover of and from the defendant 50 percent or one-half of the aggregate of damages as aforesaid which amount to the sum of $95,936.25. The

amount of the plaintiff's recovery is limited to $47,968.13. A separate judgment conforming to this opinion will be entered.